**E-FILED**
Monday, 05 August, 2013  02:25:51 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF ILLINOIS

PEORIA DIVISION

| | | |
|---|---|---|
| MICHAEL D. WOLIN, Derivatively on Behalf of CATERPILLAR INC., | ) ) ) | Case No. |
| Plaintiff, | ) ) | |
| v. | ) ) ) | |
| DOUGLAS R. OBERHELMAN, EDWARD J. RAPP, WILLIAM A. OSBORN, DANIEL M. DICKINSON, JESSE J. GREENE, JR., DENNIS A. MUILENBURG, DAVID R. GOODE, PETER A. MAGOWAN, JOSHUA I. SMITH, JUAN GALLARDO, CHARLES D. POWELL, EDWARD B. RUST, JR., SUSAN C. SCHWAB, MILES D. WHITE, DAVID L. CALHOUN and JON M. HUNTSMAN, JR. | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) ) | |
| -and- | ) ) | |
| CATERPILLAR INC., a Delaware corporation, | ) ) ) ) | |
| Nominal Defendant. | ) ) | DEMAND FOR JURY TRIAL |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH
OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT

TABLE OF CONTENTS

I.      NATURE AND SUMMARY OF THE ACTION ............................................................1

II.     JURISDICTION AND VENUE ..............................................................................6

III.    THE PARTIES...................................................................................................6

        A.      Plaintiff ...............................................................................................6

        B.      Nominal Defendant................................................................................6

        C.      Defendants ..........................................................................................7

IV.     CATERPILLAR'S PURCHASE OF SIWEI....................................................13

        A.      The Timeline for Caterpillar's Purchase of Siwei ................................13

        B.      The Financial Terms of the Acquisition ..............................................13

V.      PLAINTIFF'S PRESUIT DEMAND ON CATERPILLAR FOR BOOKS AND
        RECORDS ........................................................................................................15

VI.     The Board Possessed Sufficient Information That It Should Have Known the Purchase
        Price Was Inflated............................................................................................23

        A.      The Significance of 320 days outstanding of Average Receivable .......................23

        B.      The Board Was Aware or Should Have Been Aware That the Acquisition
                Resulted in Only a Small Percentage of Tangible Assets being Acquired............25

        C.      The Financial Information Provided to the Board Clearly Showed That Siwei's
                Historical Financial Performance Did Not Justify the Purchase Price .................26

        D.      Before Caterpillar Even Acquires Siwei, Dozens of Chinese Companies Accused
                of Accounting Frauds.............................................................................28

VII.    DUTIES OF THE DEFENDANTS .................................................................31

        A.      General Duties of the Board Pursuant to Caterpillar's Internal Governance
                Standards.............................................................................................31

        B.      Fiduciary Duties....................................................................................32

        E.      Additional Duties of the Audit Committee Defendants..........................32

        F.      Breaches of Duties .................................................................................34

VIII.   DAMAGES TO CATERPILLAR .................................................................35

IX.      DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS ........................................35

         A.      Demand Is Excused Because the Defendants' Conduct in the Acquisition of
                  Siwei Was Not a Valid Exercise of Business Judgment........................................36

         B.      Demand Is Excused Because Defendants Calhoun, Dickinson, Gallardo, Goode,
                  Greene, Huntsman, Magowan, Muilenburg, Oberhelman, Osborn, Powell, Rust,
                  Schwab, Smith, and White Face a Substantial Likelihood of Liability for Their
                  Breaches ..............................................................................................................37

COUNT I - For Breach of Fiduciary Duty Against Defendants ......................................................40

COUNT II - Against Defendants for Waste of Corporate Assets...................................................41

COUNT III – AGAINST DEFENDANTS FOR Unjust Enrichment............................................41

PRAYER FOR RELIEF ...............................................................................................................42

JURY DEMAND ...........................................................................................................................42

## I. NATURE AND SUMMARY OF THE ACTION

1.      This is a verified shareholder derivative action brought by plaintiff on behalf of nominal defendant Caterpillar Inc. ("Caterpillar" or the "Company") against certain of the Company's officers and directors for breaches of fiduciary duties, waste of corporate assets, and unjust enrichment.  These wrongs resulted in hundreds of millions of dollars in damages to Caterpillar, in addition to damage to its reputation, goodwill, and standing in the business community.

2.      This action arises out of Caterpillar's acquisition of a Chinese maker of hydraulic roof supports used in underground coal mining, ERA Mining Machinery Limited ("ERA"), and its wholly owned subsidiary Zhengzhou Siwei Mechanical & Electrical Manufacturing CO., Ltd. (ERA and Siwei will be referred to jointly as "Siwei").  Siwei was a public company listed on the Hong Kong Exchange.[1]  On November 7, 2011, the Board of Directors of Caterpillar (the "Board") passed a resolution authorizing the purchase of Siwei, and also authorized an immediate $50 million loan to Siwei ("Resolution").  In June 2012, the Company completed the transaction (the "Acquisition") for $690 million.  At the time, Caterpillar recorded $476 million in goodwill related to the Acquisition.[2]

3.      This potential deal had been presented to the Board by two senior executives of Caterpillar, Edward Rapp ("Rapp") and Steven Wunning ("Wunning").  Rapp was the Chief

---

[1] On September 30, 2010, a reverse takeover of ERA by Siwei Holdings Limited was orchestrated, combining the two companies.  The Company then changed its name to "ERA Mining Machinery Limited."

[2] *See* Caterpillar form 10-Q, filed November 2, 2012, for the period ended September 30, 2012 ("Nov. 2012 10-Q"), page 51, stating, "Goodwill of $476 million, substantially all of which is non-deductible for income tax purposes, represents the excess of the consideration transferred over the net assets recognized and represents the estimated future economic benefits arising from other assets acquired that could not be individually identified and separately recognized. Goodwill will not be amortized, but will be tested for impairment at least annually."

Financial Officer ("CFO") at the time of the Acquisition, until January 1, 2013. He was the Group President of from Caterpillar 2007 until January 1, 2013, when he assumed administrative responsibility for Caterpillar's China Operations as the Group President Construction Industries & Growth Markets of Caterpillar, Inc. Wunning is Group President for the Resource Industry Group.

4.    On January 18, 2013, a mere seven months after the Acquisition, Caterpillar announced that it would be required to take a non-cash goodwill impairment charge of approximately $580 million, over 120% of the goodwill it had recorded at the time of the Acquisition, and 84% of the purchase price paid by Caterpillar ("January 2013 Press Release").[3] This write-down meant that none of the goodwill Caterpillar recorded had any future benefit and thus could be justified. The January 2013 Press Release stated in pertinent part:

> PEORIA, Ill. – Caterpillar Inc. (NYSE: CAT) today announced that an internal investigation of its recently acquired company, ERA Mining Machinery Limited (ERA), including its wholly owned subsidiary Zhengzhou Siwei Mechanical & Electrical Manufacturing Co., Ltd., commonly known as "Siwei," has uncovered deliberate, multi-year, coordinated accounting misconduct concealed at Siwei, located in Zhengzhou, China.

---

[3]   Goodwill is "[a]n asset representing the future economic benefits arising from other assets acquired in a business combination . . . that are not individually identified and separately recognized." Financial Accounting Standards Certification ("FASC") 350-20-20. The amount of goodwill is the excess of the purchase price over the fair market value of the assets acquired. The *Wikipedia* entry for goodwill states "Goodwill is an accounting concept meaning the value of an asset owned that is intangible *but has a quantifiable "prudent value" in a business*." http://en.wikipedia.org/wiki/Goodwill_(accounting).   Once recorded, a company is required under Generally Accepted Accounting Principles ("GAAP") to write down the balance if there is an impairment or reduction in the value of the acquired company. The Nov. 2012 10-Q stated, "Factors that contributed to a purchase price resulting in the recognition of goodwill include expected cost savings primarily from increased purchasing power for raw materials and a reduction in other manufacturing input costs, expanded underground mining equipment sales opportunities in China and internationally, along with the acquired assembled workforce. These values represent a preliminary allocation of the purchase price subject to finalization of post-closing procedures." Caterpillar's write-down confirms that it obtained only very little of these future benefits in the acquisition. See Proxy Appendix, at A-30.

Caterpillar's investigation determined several Siwei senior managers engaged in deliberate misconduct beginning several years prior to Caterpillar's acquisition of Siwei. This deliberate misconduct at Siwei will result in a non-cash goodwill impairment charge of approximately $580 million, or $0.87 per share, in the fourth quarter of 2012.

Caterpillar removed several senior managers at Siwei who were responsible for the misconduct and a new leadership team has been put in place. The responsibilities for Siwei manufacturing operations have been moved to Caterpillar's China Operations Division, led by Vice President Qihua Chen, a long time Caterpillar employee. The sales and support organization at Siwei will report to Kebao Yang, Caterpillar Global Mining General Manager for China and Korea.

"The actions carried out by these individuals are offensive and completely unacceptable. This conduct does not represent, in any way, shape or form, the way Caterpillar does business or how we expect our employees to work, which is spelled out in Caterpillar's Worldwide Code of Conduct," said Caterpillar Chairman and CEO Doug Oberhelman. "Once our investigation confirmed that misconduct had taken place at Siwei, we moved quickly and decisively to hold the responsible leaders directly accountable for the wrongdoing. Accountability is a critical way that we measure leaders at Caterpillar, and it is my expectation that leaders set an example and are accountable for their actions and results."

Caterpillar has advised the Hong Kong Securities and Futures Commission of these issues and has filed a Form 8-K with the United States Securities and Exchange Commission disclosing the impairment charge. Caterpillar's investigation is ongoing.

*****

Caterpillar first became concerned about an issue when discrepancies were identified in November 2012 between the inventory recorded in Siwei's accounting records and the company's actual physical inventory. This was determined by a physical inventory count conducted at Siwei as part of Caterpillar's integration process. Caterpillar promptly launched a comprehensive review and investigation into the nature and source of this discrepancy. This extensive review has identified inappropriate accounting practices involving improper cost allocation that resulted in overstated profit. The review further identified improper revenue recognition practices involving early and, at times, unsupported, revenue recognition.

5.     During an interview with *Reuters*, a (now former) member of the Board stated that the Board was distracted at the time by a much larger transaction and paid relatively little attention to the Siwei acquisition. *Reuters* quoted the unnamed Board member, in reference to

the huge write-down, as stating, "[i]t came as a complete surprise to us…It was presented to us as a pretty straightforward transaction.  It's a shame.  It should have been investigated further." (*Reuters,* January 18, 2013).

6.     Defendants breached their fiduciary duties to Caterpillar and its shareholders by authorizing the Acquisition at an inflated price when they either (i) knew that Siwei's financial condition did not support the valuation that was represented to them; and/or (ii) had possession of facts, which if properly considered, would have alerted Defendants to the fact of Siwei's overvaluation and/or its manipulation of its financial data.  They also breached their fiduciary duties by failing to require due diligence of Siwei's financial information, thereby failing in their oversight of the Acquisition and failing to require a process that would have revealed the fraudulent inventory and revenue amounts which otherwise were not discovered until November 2012.

7.     The facts that were brought to the Board's attention before the Acquisition closed included, *inter alia*,: (i) Siwei's aging receivables approximating one year in time outstanding, on average, and the ominous fact that the aging kept deteriorating in the months prior to the closing of the Acquisition; (ii) Siwei's desperate need for an immediate $50 million cash infusion from Caterpillar in order to continue  operations, to be paid to Siwei immediately upon the Board's passage of the Resolution, before completion of due diligence and before the Acquisition closed; (iii) the large percentage of the purchase price which would be attributed to goodwill, the recovery of which was highly doubtful in light of the continuous deteriorating of the aging of receivables; (iv) the fact that Siwei's "recorded" sales were highly questionable and were, in fact, illusory in light of the increasingly deteriorating aging of the receivables recorded in connection with those purported "sales"; (v) the fact that Siwei missed its 2011 profit forecast

4

and actually recorded a $2 million loss for 2011 instead of the projected $16 million profit, a clear indication that Siwei had serious operational problems, including the inability to record revenue and that its profit picture was far from robust; and (vi) existing compliance problems with Chinese regulatory authorities and requirements.  (collectively, the "Red Flags").

8.      The documents provided by Caterpillar to plaintiff in response to his demand to inspect Caterpillar's books and records pursuant to Delaware law[4], disclose that Defendants breached their fiduciary duties to Caterpillar and its shareholders by: 1) consciously disregarding the Red Flags; 2) giving senior management a virtual blank check to purchase Siwei despite the adverse facts known to them concerning Siwei's operating and financial condition and prior to the completion of due diligence; 3) failing to direct management to re-negotiate the purchase price for Siwei and/or conduct additional due diligence upon learning months before the close of the Acquisition that Siwei had recorded a $2 million loss, rather than the $16 million profit for 2011 it had forecast and that its receivables had continued to deteriorate significantly; and 5) failing to properly oversee the process for the Acquisition, including the due diligence of Siwei's finances and operations.

9.      Additionally, prior to the Acquisition, accounting scandals involving Chinese companies were highly publicized and widespread, providing ample warnings to the Defendants to conduct careful and adequate due diligence.

10.     Plaintiff brings this derivative action to recover the damages that Defendants caused the Company to sustain.  In addition to grossly overpaying for Siwei, Defendants' wrongs resulted in damage to Caterpillar's reputation, goodwill and intangible assets, and standing in the business community.

---

[4] *See* Paragraph 41, below.

5

## II.     JURISDICTION AND VENUE

11.     This Court has jurisdiction under 28 U.S.C. §1332 because plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.   This action is not a collusive action designed to confer jurisdiction on the court of the United States that it would not otherwise have.

12.     This Court has jurisdiction over each defendant because nominal defendant Caterpillar is a corporation that conducts business in and maintains its principal executive offices within this District and each of the individual defendants has sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper under 28 U.S.C. §1391(a) because Caterpillar maintains offices within this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the individual defendants participated in actions in this District in connection with the Acquisition and have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## III.    THE PARTIES

### A.     Plaintiff

14.     Plaintiff Michael D. Wolin ("Plaintiff") was a shareholder of Caterpillar at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Caterpillar shareholder.  Plaintiff is a citizen of New Jersey.

### B.     Nominal Defendant

15.     Nominal defendant Caterpillar is a Delaware corporation with principal executive offices located at 100 NE Adams Street, Peoria, Illinois.  Caterpillar is a citizen of both Delaware

and Illinois.  Caterpillar is the world's leading manufacturer of construction and mining equipment, diesel and natural gas engines, industrial gas turbines, and diesel-electric locomotives.  In 2012, nearly 20% of Caterpillar's employees and 30% of its global dealers were located, and approximately 15% of Caterpillar sales and 24% of Caterpillar profits were generated in the Asia Pacific.  In pursuit of its goal of expanding its Asian operations, the Company acquired Siwei.

### C.    Defendants

16.    Defendant Douglas R. Oberhelman ("Oberhelman") is and has been since November 2010, the Chairman of Caterpillar's Board of Directors (the "Board").  He is also, and has been since July 2010, the Chief Executive Officer ("CEO").  Defendant Oberhelman was also Caterpillar's CEO-Elect from October 2009 to July 2010; Vice-Chairman from October 2009 to November 2010; Group President from 2002 to October 2009; and Vice President from 1998 to 2002.  As a member of the Board, Oberhelman approved the Acquisition despite facts known to him, alerting him of Siwei's overvaluation, and failed to undertake reasonable steps to make an informed decision, which steps would have alerted him to the over-valuation of Siwei.  As CEO, Oberhelman had access to information which did or should have alerted him to the Red Flags at Siwei.  He knowingly, recklessly, or with gross negligence failed to act on an informed basis and breached his fiduciary duties in voting to pass the Resolution and by encouraging and permitting the Acquisition to close at an inflated price.  Caterpillar paid defendant Oberhelman the following compensation as an executive:

| Year | Salary | Stock & Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation | Total |
|------|--------|------------------------|----------------------------------------|-------------------------|------------------------|-------|
| 2011 | $1,429,506 | $8,309,208 | $4,934,935 | $2,080,873 | $147,501 | $16,902,023 |
| 2012 | $1,562,508 | $10,780,000 | $5,049,988 | $4,636,668 | $345,580 | $22,374,744[5] |

Defendant Oberhelman is a citizen of Illinois.

17.     Defendant Edward J. Rapp ("Rapp") has been Caterpillar's CFO since June 2010 and has also been a Group President since 2007.  Rapp was responsible for the Company's China operations and was the driving force behind the Acquisition.  On information and belief, Rapp presented the Acquisition to the Board and pushed for its completion despite facts known or available to him, alerting him to Siwei's serious financial problems, declining profit and highly questionable accounting, including recording of receivables that were, on average,  more than one year old and continuously aging.  As CFO, Rapp had access to information which did or should have alerted him to, *inter alia*, the Red Flags at Siwei and knew that Siwei's problems raised serious questions as to the true valuation of Siwei.  Rapp knowingly, recklessly, or with gross negligence failed to conduct adequate due diligence of Siwei prior to the Acquisition. Caterpillar paid defendant Rapp the following compensation:

---

[5] In its 2013 Annual Meeting Proxy Statement ("2013 Proxy Statement") filed with the SEC in April 2013, at 37, Caterpillar states "In making its compensation decisions, the Committee also considered the goodwill impairment charge relating to Siwei. In exercising its discretion, the Committee included the impact of the impairment charge for calculating NEO bonuses under ESTIP, resulting in a payout factor of 90.96 percent based on the Company's 2012 OPACC results and 78.63 percent for the 2012 Resource Industries OPACC results. Excluding the impact of the impairment charge, the Company's 2012 OPACC and the 2012 Resource Industries OPACC would have resulted in a payout factor of 98.39 percent and 100.40 percent, respectively. . . . Mr. Oberhelman's ESTIP calculation was based 100 percent on the Company's 2012 OPACC results, and for the other NEOs, the Company's 2012 OPACC results were weighted between 20 percent to 80 percent of their respective ESTIP calculations. . . . In contrast, the Committee neutralized the impact of the Siwei matter for bonus payouts for all employees, other than the CEO and executive officers reporting directly to the CEO."

| Year | Salary | Bonus | Restricted Stock Awards | Stock & Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation | Total |
|------|--------|-------|-------------------------|-----------------------|-----------------------------------------|--------------------------|------------------------|-------|
| 2011 | $723,504 | $186,211 | $115,170 | $2,065,254 | $1,880,108 | $789,978 | $90,713 | $5,850,938 |
| 2012 | $827,757 | - | $256,550 | $2,628,738 | $1,961,748 | $1,396,792 | $103,173 | $6,918,208 |

Rapp is a citizen of Illinois.

18.     Defendant William A. Osborn ("Osborn") has been a Caterpillar director since 2000.  Osborn is also Chairman of Caterpillar's Audit Committee and has held that post since at least April 2011.   Osborn was tasked with overseeing the Company's "business risk management" as a member of the Audit Committee, and was classified by the Board as an "audit committee financial expert."   Osborn was formerly Chairman and CEO of Northern Trust Corporation (multibank holding company) and The Northern Trust Company (bank).   Northern Trust has been the agent bank for the sales of securities/notes by Caterpillar Financial Securities Corp., a wholly-owned finance subsidiary of Caterpillar.  Osborn is a citizen of Illinois.  Osborn is a director of Abbott Laboratories with Defendant White.

19.     Defendant Daniel M. Dickinson ("Dickinson") has been a Caterpillar director since December 2006.  Dickinson is also a member of Caterpillar's Audit Committee and has held that post since at least April 2011.  Dickinson was tasked with overseeing the Company's "business risk management" as a member of the Audit Committee, and was classified by the Board as an "audit committee financial expert."  Dickinson is a citizen of Illinois.

20.     Defendant Jesse J. Greene, Jr. ("Greene") has been a Caterpillar director since January 2011.  Defendant Greene was also a member of Caterpillar's Audit Committee from approximately April 2011 to April 2012.  Greene was tasked with overseeing the Company's "business risk management" as a member of the Audit Committee, and was classified by the Board as an "audit committee financial expert."  Green is currently an instructor at Columbia

9

Business School in New York City where he teaches corporate governance, risk management and other business topics at the graduate and executive education levels. He was formerly Vice President of Financial Management and Chief Financial Risk Officer of International Business Machines Corporation (computer and office equipment). Greene is a citizen of New York.

21.     Defendant Dennis A. Muilenburg ("Muilenburg") has been a Caterpillar director since June 2011. Defendant Muilenburg is also a member of Caterpillar's Audit Committee and has held that position since at least December 2012. Muilenburg was tasked with overseeing the Company's "business risk management" as a member of the Audit Committee, and was classified by the Board as an "audit committee financial expert." Muilenburg has been Executive Vice President of The Boeing Company (aerospace/defense products and services) and President and Chief Executive Officer of Boeing Defense, Space & Security since September 2009. Muilenburg is a citizen of Illinois.

22.     Defendant David R. Goode ("Goode") has been a Caterpillar director since 1993. He was formerly Chairman, President and CEO of Norfolk Southern Corporation. Goode is a citizen of Virginia. He is also a director of Delta Airlines, Inc., Aeroquip-Vickers, Inc., Russel Reynolds Associates, Inc., and Texas Instruments.

23.     Defendant Peter A. Magowan ("Magowan") has been a Caterpillar director since 1993. He is the Managing General Partner and President of the San Francisco Giants (major league baseball team) and Chairman (1980-1998) and Chief Executive Officer (1980-1993) of Safeway Inc. (food retailer). Also, he served as a director of the Vons Companies, W5 Networks, Inc., Amphion Semiconductor, Ltd., 1xReveal, Inc.

24.     Defendant Joshua I. Smith ("Smith") has been a Caterpillar director since 1993. Smith is a citizen of Maryland.  He is the Chairman and Managing Partner of The Coaching Group LLC.  He also serves as a director of Federal Express Corp. and Allstate Insurance Corp.

25.     Defendant Juan Gallardo ("Gallardo") has been a Caterpillar director since 1998. Gallardo is currently Chairman and was formerly CEO of Grupo Embotelladoras Unidas S.A.B. de C.V. (beverages and bottling).  Gallardo is believed to be a citizen of Mexico.

26.     Defendant Charles D. Powell ("Powell") has been a Caterpillar director since 2001.  Powell was formerly Chairman of Capital Generation Partners (asset and investment management) and is currently Chairman of LVMH Services Limited (luxury goods) and Magna Holdings (real estate investment).  He is currently also a director of Textron, Inc.  Powell is believed to be a citizen of the United Kingdom.

27.     Defendant Edward B. Rust, Jr. ("Rust") has been a Caterpillar director since 2003. Rust is currently Chairman, CEO and President of State Farm Mutual Automobile Insurance Company (insurance). He is also President and CEO of State Farm Fire and Casualty Company, State Farm Life Insurance Company and other principal State Farm affiliates.  Rust is a citizen of Illinois.  He is director of Helmerich and Payne, Inc. and McGraw Hill Companies, Inc.

28.     Defendant Susan C. Schwab ("Schwab") has been a Caterpillar director since June 2009.  She is a director of Federal Express along with Defendant Powell and a director of Boeing with Defendant Calhoun.  She was the U.S. Trade Representative from 2006 to 2009. Schwab is a citizen Maryland.

29.     Defendant Miles D. White ("White") has been a Caterpillar director since January 2011. White is currently Chairman and Chief Executive Officer of Abbott Laboratories.  He also serves on the board of McDonald's and MediSense.  White is a citizen of Illinois.

30.     Defendant David L. Calhoun ("Calhoun") has been a Caterpillar director since June 2011.  Calhoun is currently Chief Executive Officer (since May 2010) and a Director (since January 2011) of Nielsen Holdings N.V. (marketing and media information) and Chairman of the Executive Board and Chief Executive Officer of The Nielsen Company B.V. (since September 2006).  Prior to his positions at Nielsen, Mr. Calhoun served as Vice Chairman of General Electric Company and President and Chief Executive Officer of GE Infrastructure.  He is also a director of Boeing with Defendant Schwab.  Calhoun is a citizen of Connecticut.

31.     Defendant Jon M. Huntsman, Jr. ("Huntsman") has been a Caterpillar director since April 2012.  He was the U.S. Ambassador to China from 2009-2011.  He also serves as a director of Ford and Huntsman Corp.  Huntsman is a citizen of Utah.

32.     Defendants breached their fiduciary duties to the Company.  Each of the Director Defendants (Calhoun, Dickinson, Gallardo, Goode, Greene, Huntsman, Magowan, Muilenburg, Oberhelman, Osborn, Powell, Rust, Schwab, Smith, and White), except for Huntsman, initially voted to pass the Resolution that would lead to the Acquisition despite their knowledge of the Red Flags alerting them to Siwei's operational and financial problems, highly irregular and questionable accounting practices and overvaluation.  Following receipt of additional information on the Red Flags prior to the closing of the Acquisition, the Director Defendants knowingly or recklessly failed to act on that information and permitted the Acquisition to close at an inflated price.  Defendant Rapp participated in all of the events leading to the Acquisition and with knowledge of the Red Flags knowingly or recklessly failed to act on that information and permitted the Acquisition to close at a hugely inflated price.  As the direct result of the overvaluation of Siwei and the inflated purchase price paid by Caterpillar, Caterpillar was

required to, seven months later, write down the value of Siwei by approximately $580 million,

which represented approximately 84% of the consideration paid.

## IV.   CATERPILLAR'S PURCHASE OF SIWEI

### A.  The Timeline for Caterpillar's Purchase of Siwei

33.    The Acquisition progressed according to the following timeline of events:

- The Indicative Offer was made in or about September 2011.
- September 23, 2011; "indicative offer and agreement with key shareholders";
- October 2011: Potential acquisition presented to the Board;
- November 7, 2011: Board informed of problems with receivables and other problems comprising the Red Flags;
- November 7, 2011: The Board passed Resolution to move forward on the Acquisition for up to $964 million and to loan Siwei $50 million;
- November 10, 2011; Joint announcement that Caterpillar has made an offer to acquire all of the issued shares of ERA;
- November 15, 2011 (approximately); $50 million loan made by Caterpillar to Siwei;
- December 26, 2011; MOFCOM[6] filing accepted;
- January 2012 update Memorandum to the Board;
- February 21, 2012; MOFCOM questions received;
- March 2012 update Memorandum to the Board advising the Board that Siwei's 2011 financial results missed outlook with slower growth and that Siwei recorded a $2 million loss instead of $16 million profit;
- March 2012; Had completed valuation of the loan-note/earn-out, paid the filing fee, selected the shareholder agent, received feedback indicating would meet 90% shareholder acceptance threshold;
- April 11, 2012; Board Meeting at which Board discusses earnings miss, and the fact that Siwei's average age of its receivables have grown to 371 days;
- April 13, 2012; MOFCOM approval;
- Late May/early June Memorandum to the Board indicates that due diligence is complete;
- June 6; 2012 Press Release announcing Caterpillar completed its tender offer for Siwei.

### B.  The Financial Terms of the Acquisition

34.    The Indicative Offer was made in or about September 2011.  It was structured so

that the price would ultimately be set within a certain range depending on the final parameters of

---

[6]  Ministry of Commerce of the Peoples' Republic of China.

the deal, which allowed Siwei shareholders to choose between two types of consideration in exchange for their shares: 1) cash consideration or 2) a loan note issued by Caterpillar (Luxembourg) Investment Co. S.A. that provided for the holder to receive a range of payment depending on Siwei's consolidated gross profit for 2012 and 2013.[7]  According to Caterpillar's 2013 Proxy Statement and Proxy Appendix, this breakdown between the two alternatives resulted in a preliminary equity purchase price of approximately $677 million for substantially all of the issued shares of Siwei.[8]

35.     On November 7, 2011, the Board passed a Resolution permitting Caterpillar to pay up to $964 million for Siwei, including 1) the equity purchase price of $834 million; 2) the net debt assumed of $83 million[9]; and 3) ███████████████████████████. (CAT000038).

36.     The Resolution also permitted Caterpillar to make an immediate loan of $50 million to Siwei.

37.     On June 6, 2012, Caterpillar issued a press release announcing that the Company completed its Tender Offer for Siwei.  Caterpillar recorded $476 million in goodwill, equating to 63% of the total purchase price.[10]

---

[7]  Proxy Appendix, at A-78.  Caterpillar stated in the 2013 Proxy Statement that the contingent consideration would be remeasured each reporting period at its estimated fair value.  *Id.*  As of December 31, 2012, despite Caterpillar's discovery of the inventory and other problems in November 2012, there was no adjustment to the contingent consideration.

[8]  "Preliminary" refers to the fact that Caterpillar was able to adjust a small percentage of the earn-out to the Siwei shareholders based on Siwei's financial performance for 2012 and 2013. *Id.*  The remaining shares were purchased from the relevant Shareholders for $7 million by Caterpillar in October 2012.  *Id.*

[9]  The 2013 Proxy Statement stated that Caterpillar assumed Siwei's liabilities in the "approximate amount of $626 million."  *Id.*

[10]  Approximately 4 billion Siwei shares were tendered for the cash alternative and approximately 1.6 billion Siwei shares were tendered for the loan note alternative.  Proxy Appendix, A-55.  The premium to Siwei's shareholders was enormous, representing a one-day

38.     Caterpillar stated in its 2013 Proxy Statement that Siwei's tangible assets as of the Acquisition date were $598 million, including receivables of $184 million and inventory of $77 million.  Proxy Appendix, A-55.

39.     Caterpillar also stated in the 2013 Proxy Statement that the transaction would result in goodwill of $625 million, substantially all of which was non-deductible for income tax purposes.  Proxy Appendix, A-55.  The goodwill represented the excess of the consideration transferred over the fair value of the net assets recognized and "represented the estimated future economic benefits arising from other assets acquired that could not be individually identified and separately recognized."

## V.     PLAINTIFF'S PRESUIT DEMAND ON CATERPILLAR FOR BOOKS AND RECORDS

40.     On January 23, 2013, counsel for Plaintiff sent a letter on Plaintiff's behalf to Defendant Oberhelman at Caterpillar's headquarters, pursuant to Delaware's General Corporations Law, 8 Del. C. 220(b) (Inspection of Books and Records), requesting Caterpillar provide specified books and records relating to Caterpillar's acquisition of Siwei.  *See Exhibit A* (Letter from Deborah R. Gross, Esq. to Douglas R. Oberhelman and Members of the Board, dated January 23, 2013 (the "Document Demand").

41.     In response to the Document Demand, Caterpillar produced 65 pages, all of which relate to the Board's role in the Acquisition, as follows:

- 2011 Board Meeting summary (undated) (CAT00001-3);
- Materials for the October 12, 2011 Board Meeting, including the Agenda, a Power Point concerning the proposed Siwei acquisition presented by Wunning, a memorandum authored by Wunning and redacted Minutes for the meeting (CAT000007-26);

---

premium of approximately 33% and a premium of over 69% to the price of Siwei's stock one month prior to the Acquisition.

- Materials for the special telephonic November 7, 2011 Board Meeting, including a Power Point concerning the proposed Siwei acquisition presented by Wunning, a memorandum authored by Wunning, and redacted Minutes for the meeting (CAT000027-52);
- Three update memoranda by Wunning, from approximately December 2012 (CAT000065), January 2012 (CAT000053-54) and March 2012 (CAT000055-56);
- Materials for the April 11, 2012 Board Meeting, including heavily redacted Minutes for the meeting and a Power Point entitled "Group Presidents Business Unit Report" (CAT000057-62);
- Update memorandum, authored by Wunning, from approximately late May/early June 2012 (CAT000063-64);
- Updated memo authored by Wunning, to summarize initial media, competitor and dealer reaction to Siwei acquisition and an update on the China anti-monopoly filing. (CAT000065).

42.     The documents received by Plaintiff pursuant to the Document Demand demonstrate that all of the Defendants were aware of adverse facts concerning Siwei's true financial and operational condition ("Red Flags").  The Red Flags clearly show that Siwei was being overvalued by Caterpillar senior management, including Rapp and Oberhelman, and that appropriate due diligence, in light of the Red Flags, would have readily shown that, *inter alia*, the purchase price which Rapp demanded of the Board and to which the Board blindly acceded was inflated and that Siwei's tangible assets and future business prospects could not support the $740 million valuation by Rapp.

43.     In sum, the documents received in response to the Document Demand demonstrate the following facts.

- The Board consciously disregarded the Red Flags concerning Siwei that were presented to it and authorized the Acquisition on the original terms demanded by Rapp and Oberhelman without requiring appropriate due diligence;
- Caterpillar's acquisition of Siwei was discussed at four Board meetings.
- The information provided to the Board before it passed the Resolution raised Red Flags concerning the true financial and operating condition of Siwei that cast grave doubt as to the propriety of the purchase price Caterpillar senior management, including Rapp, was proposing to pay for Siwei;

16

- The Board Members consciously failed to oversee the due diligence of Siwei in light of the Red Flags known to the Board and permitted senior management to close on the Acquisition at a grossly inflated purchase price and without requiring any justification based on the due diligence senior management was purportedly conducting for the purchase price, despite the fact that additional Red Flags were presented to the Board before the Acquisition closed.

44.    Caterpillar's purchase of Siwei was spear-headed by Wunning and Rapp.  In or about the Fall of 2011, Wunning wrote a presentation for the Board regarding the purchase of Siwei ("October Memorandum").  This 3-page memorandum was entitled "China Underground Coal Strategy and Potential Acquisition."  The Executive Summary contained in the October Memorandum focused on the business reasons that Caterpillar would want to acquire Siwei: 1) the size and growth of the Chinese coal market; 2) Caterpillar's competition for entry into the Chinese coal market; 3) ███████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████ 4) the goal of purchasing Siwei for approximately $800 million; 5) ████████████████████████████████████████████ 6) the fact that initial negotiations and due diligence were underway; and 7) ████████████████ ███████████████████████████████████████.

45.    This October Memorandum also included the following financial information concerning Siwei's finances (CAT000004):

- Siwei was established in 2003 to manufacture roof supports, which represents 55% of the value in complete underground coal mining systems;
- Since 2008, Siwei has been growing at a 25% compound annual rate;
- Siwei has built an effective direct distribution network and now holds nine PINS with a machine population in 120 mines and 13 provinces;
- Revenues in 2010 were $227 million, and expected to grow to more than ███ ███████████;
- A new 100-acre manufacturing campus completed in 2011 employs 3,500 people;

17

- . . . The Siwei acquisition will require an $800 million investment and deliver ███████████████████████████████████████████████████ ;

46.     The October Memorandum also stated that management would explore an earn-out provision, whereby the performance of the business determines the ultimate payment to managers.  (CAT000004-6).[11]

47.     No explanation of how senior management arrived at the $800 valuation of Siwei was presented in the documents provided to the Board.  No support was offered for any of the numbers presented to the Board.  No due diligence documents or results of the due diligence to date were shared with the Board.

48.     This document also set forth the following schedule for the acquisition:

- September: Indicative Offer and agreement with key shareholders;
- **October: finalize due diligence** (ultimately, the purported due diligence was not completed until Spring 2012) (emphasis added);
- November:  Obtain internal and Board approvals (this would be a special telephonic meeting);
- Signing: 10 to 15 days after Board approval and due diligence completion;
- February 2012:  obtain MOFCOM (China's Ministry of Finance) approval;
- Closing: 45-60 days after MOFCOM approval.  (CAT000006).

Thus, the original scenario for Board approval for the Acquisition provided that due diligence of Siwei would be completed **before** Board approval was sought by senior management.

49.     The Board had its first meeting to consider the Acquisition on October 12, 2011.  The meeting minutes ("October Minutes") (CAT000009-11) indicate that Wunning and Rapp each made a presentation to the Board concerning the potential acquisition of Siwei, also known

---

[11]   Although this provision gave Caterpillar the ability to set "low" and "high" numbers for the Acquisition, even the low number was too high.  In addition, the managers and shareholders were able to choose whether they received an immediate payment or a delayed payment, and 75% of them chose the immediate payment rather than risk the downside of the earn-out.

as "Project Sequoia" and that due diligence had not yet been completed.  All Defendants except Huntsman were present at the meeting (CAT000009).

50.     Rapp's financial presentation consisted of "the funding strategy for Sequioa" and presented the following information concerning Siwei's historical and projected revenues and earnings.

| | | History | | Forecast | | | |
|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | | | | |
| Revenue | $143* | $181 | $227 | | | | |
| EBIT | $12 | $21 | $27 | | | | |
| CapEx | $2 | $17 | $49 | | | | |

*Dollars are in millions.

51.     The presentation also provided the following:

Valuation and Synergy Opportunities

| Acquisition Price | $800 million | |
|---|---|---|
| | NPV | IRR |
| Standalone (no Synergies) | | |
| Conservative Synergies | | |
| Possible Synergies | | |
| | | |

*Earn-out agreed . . .reduces risk and retains top management.*  (CAT000019-20).

52.     The October Minutes do not indicate that any Board member asked any questions at all concerning the funding strategy, Siwei's historical or projected earnings or the posited synergies.  *See* CAT 000010.[13]  At the conclusion of the presentation, "Members of the Board

---

[12]   Also included in the Document Demand production is a power point entitled, "2011-2015 Enterprise Strategy & Our Values in Action Customers People Stockholders.  China Underground Coal Equipment Strategy".  (October Power Point") (CAT000012-26).  *See* October Power Point, CAT000025-26.  However, this document did not include any additional, relevant financial information for the Acquisition.

[13] The Minutes clearly indicate the Board asked questions about other matters: "concerning China coal consumption, the behavior of large mining companies outside of China, capabilities of state-owned competitors, intellectual property risks, environmental and safety conditions, the mining strategies of Joy Global and Komatsu, the physical location of Sequoia, branding, the

expressed their support for the strategy and the Chairman stated that if negotiations progressed, there would likely be a special telephonic meeting of the Board called to consider the acquisition." (CAT000010).

53.     Based on the contents of the Document Demand production, no information concerning any due diligence performed for the acquisition of Siwei, specifically, any underlying financial data that supported the amounts set forth in the charts above, or any other amounts presented to the Board, was shared with the Board.  No information concerning the process of due diligence, such as whether any third-parties would be involved, was discussed or sought by the Board. ██████████████████████████████████████

████████████████

54.     Thus, the October Minutes do not contain any expression of concern or raise any question by any Board Member regarding the results of the  due diligence despite the fact that the Board previously had been told that due diligence would be completed in October.

55.     Subsequently, a special telephonic meeting of the Board was held on November 7, 2011 ("November Board Meeting").    All defendants except Huntsman were present. (CAT000033).

56.     In connection with the November Board Meeting, a two-page update (CAT 000027-000028) was presented to the Board ("November Update").  For the first time, according to the November Update, the Board was informed that Caterpillar would be providing a "bridge loan" of $50 million to Siwei" to support ongoing working capital after the announcement [of a deal] and prior to closing [on the Acquisition]."  (CAT000027).  ***The November Update states***

---

motivation of Sequoia's management and ownership, political risks and regulatory approvals." (CAT000010).

20

*further that this working capital infusion is necessary because of Siwei's 320-day aged receivables problem*:

> Siwei currently is in need of additional working capital as a result of their high growth rate and significantly aged receivables (320 day average). The proposed loan is a bridge to closing and is the preferred alternative to Siwei issuing additional equity financing. The terms of the loan are favorable to Caterpillar (one-year term, 15% rate). Collateral for the loan is 27% of the outstanding shares of Siwei, which represents two and one-half times the loan amount at the current stock price.

57.     The Board was also told, for the first time that the ongoing due diligence revealed significant problems with Siwei's financial condition:

> Due diligence revealed several key issues that the parties are working to resolve. The first issue relates to the 320 days of receivables discussed above. The second issue relates to non-payment of statutory overtime and may require up to a $20 million settlement payment. The third issue involves land use rights and operating permits that are not in compliance with Chinese regulations. The final key issue relates to required facility improvements (estimated $1.5 million) including a sprinkler system, a deeper well, and an improved oil storage system. These issues continue to be worked with the Chinese government and the key shareholders. Depending on the outcome, the cash offer price and/or earn-out may be reduced by up to $30 million. (CAT 000037-38).

58.     The receivables issue is directly related to the revenue results that Wunning and Rapp presented to the Board and render them highly suspicious and most likely wholly illusory. Failure to receive payment after approximately one year would indicate that such receivables were likely not realizable and should be written off. As a consequence, Siwei's revenue and profit amounts which Rapp and Wunning presented to the Board could not be reasonably relied upon as a basis for determining Siwei's true operating results and financial condition, on both a historical and projected basis. (*See* charts above) and render illusory a large portion of the assets being represented to exist by Siwei.

59.     The Board approved the Resolution authorizing the purchase of Siwei with no conditions attached, despite the fact that due diligence was not completed and that significant

21

issues already had been identified but not resolved.  The November Resolution authorized:  1) the up to $964 million investment, including the equity purchase price of $834 million (high case), the net debt assumed of $83 million, and ███████████████████████████ and 2) $50 million working capital loan.  (CAT000038).

60.     The November Board Meeting Minutes demonstrate that the Board Members consciously disregarded the Red Flags disclosed to them at the November 2011 Board Meeting when it passed the Resolution to acquire Siwei for up to $964 million immediately after receipt of the information regarding the Red Flags.

61.     A subsequent memorandum from March 2012 (CAT 000055-56) ("March Memorandum") provided the Board with further highly adverse information concerning the operational and financial condition of Siwei.  The March Memorandum informed the Board that Siwei missed its projections for 2011, recording a $2 million loss instead of a $16 million profit and stated that: "Management is in the process of thoroughly understanding the fundamental business issues, reevaluating the financial attractiveness of the acquisition and determining if we should (or can) rescind the November 2011 voluntary general offer to acquire the company." The March Memorandum states that the Board would be briefed during the April 2012 Board Meeting.  The March Memorandum also indicates that Wunning informed the Board that the significant receivables aging issue had gotten worse with the average age outstanding of the receivables rising from 320 days to 371 days outstanding.

62.     The Board subsequently held a Board Meeting on April 11, 2012 ("April 2012 Board Meeting").  All Defendants were present at the April 2012 Board Meeting.  (CAT000057). Wunning, along with other Group Presidents, was also present at the April 2012 Board Meeting.

63.     The meeting minutes from the April 2012 Board Meeting ("April 2012 Board Meeting Minutes") (CAT000057-60) demonstrate that the Board was advised of the further adverse facts that Siwei's earnings and revenue would be "below earlier forecasts."

64.     The Board's last communication concerning the proposed Siwei acquisition came from Wunning in late May or early June 2012 (CAT000062-63), in a two-page memorandum that informed the Board that due diligence had been completed.  No further information was provided to the Board.

65.     Despite knowledge of the Red Flags which called into serious question the operational and financial *bona fides* of Siwei, the Board:  1) made no inquiry into the results of the due diligence; 2) took no steps to learn how or whether the serious issues concerning Siwei which Rapp and Wunning had presented to the Board had been resolved; and 3) did not change the valuation.  Instead, the Board abdicated it fiduciary duty, consciously disregarded the Red Flags presented to it and permitted senior management, including defendants Rapp and Oberhelman, to close on the Acquisition for grossly overvalued consideration.

## VI.     THE BOARD POSSESSED SUFFICIENT INFORMATION THAT IT SHOULD HAVE KNOWN THE PURCHASE PRICE WAS INFLATED

### A.     The Significance of 320 days outstanding of Average Receivable

66.     The Board learned on November 7, 2011 that Siwei had an average of 320-days old receivables.

67.     On April 11, 2012, before the deal closed, the Board was informed that Siwei had an average of 371-days old receivables.

68.     Accounts receivable are assets representing expected future cash inflows emanating from services performed or goods sold.  Such are classified on the financial statements as current assets, in recognition of the anticipation that they will be realized in cash

within the year.  At the time that the Board was advised that Siwei had receivables that were on the average 320-days old, such were about to reach the one year mark, and in fact, surpassed the one year mark before the Acquisition was final.

69.     A typical accounts receivable aging analysis is divided into categories such as current, 30 days, 60 days, 90 days, 120 days, 150 days and greater than180 days and overdue.

70.     Simple logic demonstrates that Siwei's on the average year old receivables should have been reviewed by the Board as an impediment to the Acquisition:  First, Siwei was reporting these receivables as assets and resulting from purportedly earned revenue, but given their age, Caterpiller should have viewed both the assets and revenue as illusory.

71.     Second, if an account is greater than 90 days old, it realistically cannot be used and is almost always disqualified from being collateral in connection with borrowing money.  Although the Board did not probe Siwei's need for an immediate $50 million loan, it seems likely that its 320-day old average receivables played a role in its need to obtain financing from Caterpillar.

72.     It is widely recognized that at six months old, the likelihood increases that the receivable cannot be collected without a collection agency or lawsuit, and accordingly, is most often written off or at least reserved in full.

73.     Aged accounts receivable give rise to multiple red flags to potential buyers including: i) customers accustomed to lax collection terms; 2) undisciplined employees who don't collect when the job is finished; 3) a business owner disconnected from the well-being of his own business; and 4) an inability to generate enough cash flow to pay vendors, leading to large outstanding payables.

74.     When a company has determined that a receivable is uncollectible, it reserves for its non-collectability in what is referred to as "an allowance for doubtful accounts," which simultaneously results in the company taking a charge, or expense, on its income statement.  The account is then "written-off" removing it from the books of the company altogether.

75.     Defendants were told that Siwei had revenue of $181 million in 2009 and $227 million in 2010.  They were then told that Siwei had 320-days old on the average receivables which had been valued by Caterpillar at $184 million.  (Proxy Appendix, Notes 10 and 23, pages A-30 and A-55).  This information about the receivables' age should have raised questions about the veracity of the revenue amounts reported, from which they stemmed.

76.     Additionally, Siwei's publicly available corporate filings, demonstrated that the amount of receivables Siwei was owed by its customers had grown 58 percent a year since 2008, and that the amount of money it was owed at a point in time during 2011 had eclipsed its total sales volume.  In addition, approximately 90 percent of those receivables were past-due when Caterpillar launched its bid to purchase Siwei.  (*Reuters*, January 24, 2013**)**.  Again, Defendants had information available to them to raise questions about the veracity of Siwei's financials and the almost $800 million price that Defendants were being asked to approve for the Acquisition.

B.      **The Board Was Aware or Should Have Been Aware That the Acquisition Resulted in Only a Small Percentage of Tangible Assets being Acquired**

77.     Goodwill is supposed to indicate incremental profits that the Company can expect to earn in the foreseeable future as a consequence of an acquisition.

78.     Siwei's gross overvaluation was apparent from the amount of goodwill Caterpillar recorded in the Acquisition.  When Caterpillar agreed to acquire Siwei in June 2012, Caterpillar disclosed that the $690 million preliminary purchase price would be allocated to approximately $223 million of net assets acquired and $467 million of goodwill.  In Caterpillar's Form 2012

10-K, filed with the SEC on February 19, 2013, the Company disclosed that it adjusted ERA's preliminary purchase price to $677 million and increased the goodwill associated with the transaction to $625 million.  This adjustment reflected that the Company acquired less than $60 million in net assets in the Acquisition.  Thus, goodwill accounted for *92%* of the purchase price allocation from the Acquisition.

79.     In light of the fact that Siwei had a loss for 2011 and its receivables were an average of 320 days, and later deteriorated to 371 days aged, the Board should have questioned not only the reliability of the revenues and the EBIT forecasted by Siwei, but also any goodwill value allocation.

80.     Moreover, a study conducted by KPMG[14] in 2010 shows that the average percentage allocation of purchase price to goodwill in the industrial products and construction industries is less than 56% and 69%, respectively.

**C.     The Financial Information Provided to the Board Clearly Showed That Siwei's Historical Financial Performance Did Not Justify the Purchase Price**

81.     Since it registered and was formed in 1995, Siwei showed lifetime retained earnings of only $33 million.[15]  The relatively meager profitability of Siwei in comparison to the very substantial purchase price, was another red flag that defendants failed to investigate.

82.     The financial information placed before the Board for its consideration can generally be summarized in three charts provided to the Board on October 12, 2011:

---

[14]   The title of the study is "Intangible Assets and Goodwill in the context of business combinations."  *See* page 11.  It collected data for 342 acquisition during the period 2003-2007 and can be found at http://www.kpmg.com/PT/pt/IssuesAndInsights/Documents/Intangible-assets-and-goodwill.pdf.  KPMG is one of the world's largest audit, tax and advisory firms. KPMG International's member firms have 145,000 professionals, including more than 8,000 partners, in 152 countries.

[15] As of December 31, 2011.

| | | History | | | Forecast | | | |
|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | | | | | |
| Revenue | $143* | $181 | $227 | | | | | |
| EBIT | $12 | $21 | $27 | | | | | |
| CapEx | $2 | $17 | $49 | | | | | |

*Dollars are in millions

Valuation and Synergy Opportunities

| Acquisition Price | $800 million | |
|---|---|---|
| | NPV | IRR |
| Standalone (no Synergies) | | |
| Conservative Synergies | | |
| Possible Synergies | | |

| | 2012 YTD | | | | 2012 Full Year | | |
|---|---|---|---|---|---|---|---|
| | Plan | Actual | | | Plan | Forecast | |
| Sales | | $3.3 | | | | | |
| Profit | | $0.8 | | | | | |
| OPACC | | $0.4 | | | | | |
| Turns | | 2.4 | | | | | |

This document focused on broad-brush descriptions of the mid-tier underground coal market in China.  It also provided the following information concerning Siwei's finances.

83.    A simple review of the information in these three charts should have alerted Defendants that the forecasts were unattainable and that the purchase price over-valued Siwei.  For example, Chart 1 shows revenue for 2010 as $227 million.  It shows EBIT (earnings before interest and taxes) as only $27 million.  Even without the profit figures before them, Defendants should have been able to see that Siwei was not making sufficient profit to recover the goodwill that was to be recorded for the Acquisition.  This analysis is further supported by the disclosure that for 2011 Siwei recorded a $2 million loss instead of the sizable profit forecasted.  Finally, adding the piece of information concerning Siwei aging receivables should have cast in doubt even the value of $27 million for Siwei's EBIT for 2010.

27

84.     Such a review of the information on the charts in connection with the information about the aging receivables and the net loss would also have demonstrated to Defendants that the forecasts for Siwei – ████████████████████████████████████████████ ████████████████████████████.

85.     However, nowhere in the record is it indicated that the Board asked questions and/or received reasonable answers to questions about these numbers.

86.     If Defendants had asked questions and required management to conduct proper due diligence, the overvaluation of the goodwill and the discrepancies could have been discovered before the Acquisition closed.

**D.      Before Caterpillar Even Acquires Siwei, Dozens of Chinese Companies Accused of Accounting Frauds**

87.     Prior to the Acquisition, there had been an overwhelming amount of public news and stories regarding accounting manipulations by Chinese companies.  Financial press reported numerous lawsuits and SEC investigations relating to accounting irregularities with regard to such entities.  Defendants disregarded all of this public information and failed to engage in adequate due diligence prior to the Acquisition.

88.     In March 2011, the Public Company Accounting Board ("PCAOB") issued an alert about accounting and auditing standards at Chinese companies.  Staff Audit Practice Alert No. 8 stated that "auditors should be particularly alert to the effect of differences in local business practices and cultural norms in emerging markets (i.e., China) to the risks of material misstatement. . ."  In a speech given by a PCAOB board member Lewis Ferguson in September 2012, he reported that "beginning in the later part of 2010, alleged financial frauds and serious accounting issues were revealed at a number of the smaller Chinese reverse merger companies. To date, 67 of these Chinese-based issues have had their auditors resign, and 126 issuers have

been deleted from U.S. securities exchanges or "gone dark" – meaning that they are no longer filing investment reports with the SEC." In fact, the Financial Times reported that by December 2012, the SEC had filed fraud allegations against 40 of such individuals or companies.

89.     In September 2011, the U.S. Justice Department announced it was investigating accounting irregularities at Chinese companies listed on U.S. Stock exchanges.

90.     Additionally, preceding the Acquisition there were a series of highly-publicized accounting scandals involving Chinese reverse-merger companies.[16] Chinese companies with market capitalizations in the billions of dollars suddenly became nearly worthless. For instance, in February 2011, shares in the China Media Express plunged 93% after a report revealed that the company allegedly manipulated its financial statements. Similarly, in June 2011, shares in Sino Forest plummeted following the release of a report claiming that Sino-Forest was a "multibillion-dollar Ponzi scheme" that was "accompanied by substantial theft." Another product of a reverse merger, Puda Coal, tricked investors into believing they were buying shares in a Chinese coal business when in fact they were investing in an empty shell company. These companies and many others frequently inflated their assets and earnings. As a result, in 2011 alone, approximately thirty Chinese reverse-merger companies saw their auditors resign and at least twenty-five were delisted from U.S. exchanges.

91.     The scandals at Chinese reverse merger companies were widespread and well-known. In an August 28, 2010 *Barron's* article discussing Chinese reverse-merger companies, published over a year before Caterpillar even offered to acquire ERA, the author described the reverse merger scenario, which looks remarkably similar to what occurred at ERA. Namely, the

---

[16] Siwei became listed in Hong Kong in 2010 through a reverse takeover with a failing home video company, ERA. By undertaking a reverse takeover in order to become public, a company does not undergo as much scrutiny as an initial public offering.

company's physical operations diverged dramatically from what the Chinese reverse merger company stated in its public filings.  In particular, the article stated:

> Financial filings the companies make with the Securities and Exchange Commission often diverge from those filed with the Chinese government – by drastic amounts.  Investor and analyst visits to corporate facilities in China reveal operations smaller and less impressive than shown in U.S. presentations.  The companies too often select auditors who have previously signed off on the financials of companies that turned out to be busts.

92.    In fact, on June 9, 2011, five months before Caterpillar announced its offer to buy Siwei, the SEC itself issued a warning to investors about the dangers of investing in reverse merger companies.  This warning stated that "there have been instances of fraud and other abuses involving reverse merger companies" and that investors "should be careful" when they consider investing in the companies' stocks.[17]   Moreover, the SEC warning discussed how the SEC suspended trading for a number of reverse-merger entities, including, HiEnergy Technologies, Inc., and Digital Youth Network Corp.  In addition to these trading suspensions, the SEC also stated that it revoked the securities registration of several other reverse-merger companies.

93.    The public warnings issued by numerous sources, including the SEC and the prevalence of the fraud affecting Chinese reverse-merger companies, were red flags that the Individual Defendants disregarded during their pursuit of the Acquisition.  In addition, both Siwei and its parent company ERA were listed on the Growth Enterprise Market ("GEM") of the Hong Kong Stock Exchange, which was "designed to accommodate companies to which a higher investment risk may be attached."  These risks demanded a heightened level of scrutiny and due diligence which the Individual Defendants did not undertake.

---

[17] SEC, Office of Investor Education and Advocacy, Investor Bulletin: Reverse Mergers (June 2011).

## VII.   DUTIES OF THE DEFENDANTS

### A.   General Duties of the Board Pursuant to Caterpillar's Internal Governance Standards

94.   Caterpillar has adopted a "Guidelines on Corporate Governance Issues" ("Board Guidelines"). This document states: "The Board . . . oversees the Management of the Company and its business." Board Guidelines at 1.

95.   The primary responsibilities of the Board include:

> • evaluating the performance of the Chief Executive Officer;
> • succession planning for Chief Executive Officer and other senior executives;
> • reviewing and overseeing the implementation of the Company's strategic plans and objectives;
> • overseeing legal and ethical compliance;
> • overseeing the integrity of the Company's financial statements and the Company's financial reporting processes;
> • overseeing the Company's processes for assessing and managing risks;
> • nominating directors, appointing committee members and shaping effective corporate governance;
> • advising and counseling management regarding significant issues facing the
> Company; and
> • reviewing and approving significant corporate actions. (Board Guidelines at 1).

The Acquisition clearly fell within these duties.

96.   The Board Guidelines also state that the "Director Responsibilities" consist of the following:

> The basic responsibility of directors is to exercise their business judgment to act in what they reasonably believe to be the best interests of the Company and its stockholders. In discharging that responsibility, directors are entitled to rely on the honesty and integrity of the Company's senior executives and its outside advisors and auditors. Directors are expected to, among other things, (i) attend Board meetings and meetings of committees on which they serve, (ii) to ask incisive, probing questions and receive accurate and honest answers and (iii) to spend the time needed and meet as frequently as necessary to discharge their responsibilities. In the absence of unavoidable conflict, all directors are expected to attend the annual meeting of stockholders.

31

Again, these duties applied to the Acquisition and the Board did not fulfill them.

97.    The Board Guidelines also state that the Board "has the authority to retain such outside advisors or other experts as it deems necessary or appropriate to assist it in carrying out its responsibilities. *Board Guidelines*, page 6.  Here, the Meeting Minutes do not reflect that the Board considered whether it needed the assistance of outside advisors or experts to assist it in carrying out its duties.  This failure further supports the conclusion that the Board rubber-stamped the Acquisition.

### B.    Fiduciary Duties

98.    The Defendants owed and owe Caterpillar and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Caterpillar in a fair, just, honest, and equitable manner. The Defendants were and are required to act in furtherance of the best interests of Caterpillar and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit.

99.    Each officer and director of the Company owes to Caterpillar and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

### C.    Additional Duties of the Audit Committee Defendants

100.    The Caterpillar website describes the duties of the Audit Committee as follows:

> The Audit Committee assists the board in fulfilling its oversight responsibilities with respect to the integrity of Caterpillar's financial statements, Caterpillar's compliance with legal and regulatory requirements, the qualifications and independence of Caterpillar's Independent Registered Public Accounting Firm (auditors), the

performance of Caterpillar's internal audit function and the auditor, the effectiveness of Caterpillar's internal controls and the implementation and effectiveness of Caterpillar's ethics and compliance program. The committee performs this function by monitoring Caterpillar's financial reporting process and internal controls and by assessing the audit efforts of the auditors and the internal auditing department. The committee has ultimate authority and responsibility to appoint, retain, compensate, evaluate, and, where appropriate, replace the auditors. The committee also reviews updates on emerging accounting and auditing issues provided by the auditors and by management to assess their potential impact on Caterpillar. All members of the committee meet the standards for independence set forth in the NYSE listing standards and meet financial literacy guidelines adopted by the board. Additionally, the board has determined that each member of the committee qualifies as an "audit committee financial expert" as defined under SEC rules.

101.    These duties are also reflected in the Audit Committee Charter, eff. February 2012, which states:

The purpose of the Caterpillar Inc. ("Caterpillar" or "Company") Audit Committee is to assist the Board of Directors (the "Board") in fulfilling its oversight responsibilities with respect to:

• the integrity of Caterpillar's financial statements;
• Caterpillar's compliance with legal and regulatory requirements;
• Caterpillar's business risk management process;
• the independent auditor's qualifications and independence;
• the performance of Caterpillar's internal audit function and the independent auditor;
• the effectiveness of Caterpillar's internal controls; and
• the implementation and effectiveness of Caterpillar's ethics and compliance program.

102.    The Audit Committee Charter also permits that "In carrying out these responsibilities, the Audit Committee shall have the authority to conduct or authorize investigations into any matters within the scope of its responsibilities and the authority to retain such outside counsel, experts, and other advisors as it determines appropriate to assist it in carrying out its responsibilities." *Audit Committee Charter*, page 1.

103.    At the time that the Board voted to purchase Siwei, Defendants Dickinson, Greene, Muilenburg, and Osborn were on the Audit Committee ("Audit Committee Defendants").  Each of these Audit Committee Defendants owed specific duties to the Company and to the shareholders.

104.    Defendants Dickinson, Greene, Muilenburg, and Osborn were classified by the Board as "audit committee financial expert[s]" as the term is defined in the U.S. Securities and Exchange Commission's ("SEC") rules and regulations.  Despite these additional duties and qualifications, defendants Dickinson, Greene, Muilenburg, and Osborn disregarded the Red Flags alerting them of Siwei's accounting improprieties and its resulting overvaluation.

### D.    Breaches of Duties

105.    Each Defendant, by virtue of his or her position as an officer and/or director, owed to the Company the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Caterpillar, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

106.    The Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to purchase Siwei at an excessive and inequitable price that wasted the Company's assets, and caused Caterpillar to incur substantial damage.  As a result, Caterpillar has expended, and will continue to expend, significant sums of money.

## VIII.   DAMAGES TO CATERPILLAR

107.   As a result of the Individual Defendants' improprieties, Caterpillar materially overpaid for Siwei.   As a direct and proximate result of Defendants' actions, Caterpillar has expended, and will continue to expend, significant sums of money.   Such expenditures include, but are not limited to:

(a)   costs incurred from overpaying for Siwei;

(b)   costs incurred from the internal investigation into Siwei's alleged accounting fraud; and

(c)   costs incurred from compensation paid to the defendants who have breached their duties to Caterpillar.

## IX.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

108.   Plaintiff brings this action derivatively in the right and for the benefit of Caterpillar to redress injuries suffered, and to be suffered, by Caterpillar as a direct result of the breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by Defendants.   Caterpillar is named as a nominal defendant solely in a derivative capacity.   This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

109.   Plaintiff will adequately and fairly represent the interests of Caterpillar in enforcing and prosecuting its rights.

110.   Plaintiff was a shareholder of Caterpillar at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Caterpillar shareholder.

111.    The current Board of Caterpillar consists of the following fifteen individuals: defendants Calhoun, Dickinson, Gallardo, Goode, Greene, Huntsman, Magowan, Muilenburg, Oberhelman, Osborn, Powell, Rust, Schwab, Smith, and White.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**A.      Demand Is Excused Because the Defendants' Conduct in the Acquisition of Siwei Was Not a Valid Exercise of Business Judgment**

112.    Plaintiff challenges the transaction through which Caterpillar acquired Siwei for $677 million as a transaction which was not a valid exercise of business judgment.

113.    Each of the Defendants was a Director at the time the Board voted to acquire Siwei.

114.    The Defendants voted to approve Caterpillar's purchase of Siwei for up to $964 million despite their possession of the Red Flags as to the price that Caterpillar was paying for Siwei and in conscious disregard of that information.

115.    Defendants then consciously disregarded further Red Flags concerning Siwei's failure to make a profit and its increasing receivables, and failed to demand proper due diligence and a re-evaluation of the deal.

116.    Defendants' actions, failing to act on an informed basis and in conscious disregard for the information that they possessed, is not a protected business judgment decision. Defendants Calhoun, Dickinson, Gallardo, Goode, Greene, Huntsman, Magowan, Muilenburg, Oberhelman, Osborn, Powell, Rust, Schwab, Smith, and White had an independent duty to consider all reasonably available information before entering into the Acquisition.  This is particularly true here considering the Red Flags that alerted them of Siwei's overvaluation.

117.   At least one member of the Board has admitted that the Board "was distracted at the time by a larger transaction and paid relatively little attention to the Siwei acquisition." *Reuters*, January 18, 2013.

118.   Therefore the decision to enter into the Acquisition is not subject to the business judgment rule and demand is excused.

**B.   Demand Is Excused Because Defendants Calhoun, Dickinson, Gallardo, Goode, Greene, Huntsman, Magowan, Muilenburg, Oberhelman, Osborn, Powell, Rust, Schwab, Smith, and White Face a Substantial Likelihood of Liability for Their Breaches**

119.   Defendants face a substantial likelihood of liability for wasting hundreds of millions of dollars of the Company's assets in acquiring Siwei.  These Defendants had access to, knew and consciously disregarded numerous Red Flags, alerting them to the fact of Siwei's overvaluation.  These Red Flags included sufficient specific financial information to place in question the reasonableness of the rosy financial projections placed before them, and management's plan for the Acquisition.  Defendants were required by their positions and duties to the Company and its shareholders to take the actions necessary to make informed decision and they failed in this regard.

120.   In particular, Oberhelman, as the CEO, and Rapp, as the CFO, were, or should have been, knowledgeable of the due diligence process, if any, undertaken in the course of the Acquisition.  They also had the ability to demand due diligence and did not.  They also should have been able to connect the dots between the figures placed before them and the Board for revenue, sales and receivables, and discern the over-valuation of Siwei.

121.   Defendants Dickinson, Greene, Muilenburg, and Osborn served on the Audit Committee and were classified as "audit committee financial expert[s]" during the wrongdoing alleged herein.  The Audit Committee's Charter provides that the Audit Committee is responsible

for overseeing the Company's "business risk management."  The Audit Committee's Charter also states that the Audit Committee is responsible for monitoring "the effectiveness of Caterpillar's internal controls."  The conduct of Dickinson, Greene, Muilenburg and Osborn did not confirm to the heightened duties set forth by the Audit Committee Charter, and defendants Dickinson, Greene, Nuilenburg, and Osborn face a substantial likelihood of liability for approving the Acquisition.  Defendants Dickinson, Greene, Muilenburg, and Osborn abdicated their duties to monitor and manage "business risk" because they completely disregarded the Red Flags when they should have been able to connect the dots between the figures placed before them for revenue, sales and receivables.  They also should have been aware of the kind of information that Caterpillar would seek in due diligence and should have pushed for that information to be placed before the Board.

122.    Many of the other defendants, Osborn, Muilenburg, Goode, Magowan, Smith, Gallardo, Powell, Rust, White, Calhoun, hold or have held positions as CEO and/or Chairman of the Board at other large companies and should be held to be knowledgeable about the steps required, including due diligence, in an Acquisition.

123.    Pursuant to the Guidelines on Corporate Governance Issues, Defendants' duties included: "reviewing and approving significant corporate actions."  *See* Guidelines on Corporate Governance Issues, ¶above.  Defendants did not deliberate on the purchase price and therefore cannot be said to have "reviewed" the significant corporate action of acquiring Siwei.  The Board did not pass the Resolution on an informed basis, and did not act on an informed basis when it failed to require additional due diligence at that time or upon learning that Siwei would not make any profit, and indeed was disclosing a loss.

124.    The Board Guidelines also state that the "Director Responsibilities" consist of "The basic responsibility [] to exercise their business judgment to act in what they reasonably believe to be the best interests of the Company and its stockholders. . ."

125.    Accordingly, Defendants Calhoun, Dickinson, Gallardo, Goode, Greene, Huntsman, Magowan, Muilenburg, Oberhelman, Osborn, Powell, Rust, Schwab, Smith, and White face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

126.    The Board was aware, or should have been on notice of Siwei's financial problems and the overvaluation of the offer for Siwei.  The documents reflect that the Board gave very little consideration to the information presented to them on Siwei, simply rubber stamping management's recommendation.  This illustrates the futility of a demand.  Despite Defendants having knowledge of the claims and causes of action raised by Plaintiff as a result of the Company's internal investigation into Siwei, neither Defendants nor the current Board have filed a lawsuit against themselves or the Officer Defendants who were responsible for the wrongful conduct to attempt to recover for Caterpillar any part of the damages Caterpillar suffered and will suffer thereby.  Instead, Defendants, all consisting of Caterpillar insiders, have placed the blame on several former Siwei senior managers, who are no longer affiliated with the Company, and announced on May 16, 2013, a settlement agreement in which Caterpillar and former directors of Siwei have mutually released all their claims relating to the Acquisition as well as agreed to a material reduction in Caterpillar's total outstanding obligations related to the Acquisition.  As a result, Caterpillar has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein.

127.   The acts complained of constitute violations of the fiduciary duties owed by Caterpillar's officers and directors and are incapable of ratification.

128.   Plaintiff has not made any demand on the other shareholders of Caterpillar to institute this action since such demand would be a futile and useless act for at least the following reasons:

      (a)   Caterpillar is a publicly held company with over 655 million shares outstanding and thousands of shareholders;

      (b)   making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

      (c)   making demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

## COUNT I - FOR BREACH OF FIDUCIARY DUTY AGAINST DEFENDANTS

129.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

130.   As alleged in detail herein, the Defendants by reason of their positions as officers and directors of Caterpillar, are fiduciaries of the Company and its shareholders.  As such, they owe the Company the highest duties of due care, loyalty, candor and good faith and fair dealing.

131.   The conduct of each Defendant as alleged above constitutes a breach of his/her fiduciary duties.

132.   As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged hereinabove.

133.   Plaintiff, on behalf of Caterpillar, has no adequate remedy at law.

## COUNT II - AGAINST DEFENDANTS FOR WASTE OF CORPORATE ASSETS

134.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

135.   Defendants Rapp and Oberhelman wasted Caterpillar's corporate assets by causing the Company to materially overpay for Siwei, as alleged above.

136.   The Director Defendants wasted Caterpillar's corporate assets by passing the Resolution, and permitting the Company to materially overpay for Siwei, as alleged above.

137.   The Defendants also wasted corporate assets by paying improper compensation and bonuses to certain of the Company's executive officers that breached their fiduciary duties to Caterpillar and its shareholders.

138.   As a direct and proximate result of the Defendants breaches of fiduciary duty, the Company has sustained, and will continue to sustain, substantial harm, including the damages set forth herein.

139.   As a result of the waste of corporate assets, the Defendants are liable to the Company.

140.   Caterpillar and its shareholders have been damaged by reason of the Defendants' waste of corporate assets.

141.   Plaintiff, on behalf of Caterpillar, has no adequate remedy at law.

## COUNT III – AGAINST DEFENDANTS FOR UNJUST ENRICHMENT

142.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

41

143.    At all relevant times stated herein, Defendants received bonuses, stock options, stock appreciation rights, and/or similar such compensation from Caterpillar in breach of their fiduciary duties.  The Defendants were unjustly enriched thereby.

144.    To remedy the Defendants' unjust enrichment, this Court should order them to disgorge all proceeds they received from their bonuses and stock options.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays for judgment as follows:

A. for an order declaring that the Defendants breached their fiduciary duties to the Company;

B. for an order awarding damages, together with pre- and post-judgment interest to the Company;

C. for Plaintiffs' costs and expenses incurred in this action, including, but not limited to, experts' and attorneys' fees; and

D. for such other and further relief as may be just and proper.;

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: August 5, 2013

/s/ Marvin A. Miller
_____
MARVIN A. MILLER

MILLER LAW LLC
115 S. LaSalle Street, Suite 2910
Chicago, IL  60603
T:  312/332-3400
F: 312/676-2676

DEBORAH R. GROSS
ROBERT P. FRUTKIN
LAW OFFICES BERNARD M.
  GROSS, P.C.
Wanamaker Bldg., Suite 450
100 Penn Square East
Philadelphia, PA  19107
T:  215/561-3600
F: 215/561-3000

*Counsel for Plaintiff, Michael D. Wolin*